Lawrence Rufus Stahl was tried and convicted pursuant to § 13-11-2 (a), Code of Alabama 1975, for the double murder of two Delchamps Food Store employees who were abducted on their way to make a routine bank deposit for their employer. The abductors apparently drove the victims to an isolated location, robbed them, then shot both victims in the head with a shotgun. After hearing the aggravating and mitigating circumstances in a separate proceeding and being properly instructed accordingly, the jury set sentence at life imprisonment without parole. The trial court, in a subsequent sentencing hearing, sentenced appellant to life imprisonment without parole, and this appeal followed.
On July 11, 1977, shortly before 4:00 p.m., Richard Hacker and Terry Stainback left the Delchamps Food Store, where they were employed, to make the customary afternoon bank deposit for the store at a bank within walking distance. The deposit was never made.
On July 24, 1977, almost two weeks after the disappearance of Mr. Hacker and Ms. Stainback, their bodies were discovered in an isolated wooded area where they had been "shotgunned" to death. There was evidence at the scene that they had been robbed, bound and then shot in the head at close range with a shotgun.
Nearly two and a half years later in December, 1979, unnamed informants told authorities in Tampa, Florida, that Lawrence Stahl (the appellant) and David Waldrop had perpetrated the robbery-murders in Mobile in July, 1977. The informants not only named the appellant but also described the shooting incident. (R. 272).
The informants were subsequently interviewed in Tampa by officers from the Mobile County Sheriff's Department. Acting upon the information received, Sheriff Tom Purvis, Detectives Willie Estes and Larry Tillman, and Assistant District Attorney Neil Hanley traveled to Lakin, Kansas, (appellant's new place of residence) to question the appellant with reference the July 11, 1977, incident. They were assisted by the local Kearney County, Kansas, officials.
Sheriff McCue of Kearney County obtained an incriminating statement from the appellant on January 4, 1980, when he was brought in for questioning at the request of the Mobile authorities. (R. 284). This statement was not admitted into evidence because there was some doubt that the Miranda warnings which preceded the statement were sufficient.
After Sheriff McCue's initial interview with the appellant, the interrogation was "turned over" to the Mobile County officials. Detective Estes gave the appellant thorough Miranda
warnings after which the appellant requested an attorney. Nothing incriminating was obtained from the appellant during that meeting on January 4, so he was released. That evening Detective Estes received information that David Waldrop, appellant's alleged accomplice, had confessed to the robbery-murders and had implicated the appellant. At the request of the Mobile authorities and with their assistance, the Kearney County officials proceeded to appellant's place of employment and *Page 911 
arrested him at approximately 2:00 a.m. on Saturday morning, January 5, 1980. Again, Detective Estes gave the appellant a thorough Miranda warning. Appellant did not make any incriminating statements at this time, but, subsequently, renewed his request for an attorney.
The appellant and the Mobile authorities were later informed that an attorney would not be available until Monday, January 7.
At some time after 9:00 a.m. on that same Saturday morning, Detective Tillman reported to the appellant that the Mobile authorities had to return to Mobile but that they were going to extradite him for murder. Tillman's testimony with reference this conversation is reported at (R. 369) as follows:
 "Q Again, sir, what did you tell the Defendant at around 9:00 or 10:00 o'clock on the morning of January 5, 1980?
 "A That we were going to extradite him back to Mobile to face the charges of murder.
"Q Did he respond to this statement on your part?
"A Yes, he did.
"Q What was his response?
 "A His response was that he didn't kill those people in Mobile, it was Waldrop's gun.
. . . . .
 "Q Prior to him saying he didn't [kill] the people, it was Waldrop's gun, had you asked him any questions?
"A No, sir.
 "Q Prior to his saying he didn't kill the people, it was Waldrop's gun, had you mentioned the name Waldrop?
"A No, sir."
On cross-examination Tillman responded at (R. 371) as follows:
"Q What did you say to him?
 "A I told him that the penalty — he wanted to know what the penalty was and I told him it could be death by electrocution.
 "Q All right, sir, then tell us his exact words, as best you can remember and be fair about it, Detective Tillman. What were his words?
 "A When I told him that the charge carried death by electrocution that's when he made the statement.
"Q And what were the exact words?
 "A The exact words, `I didn't kill those people. It was Waldrop's gun.'"
and further at (R. 373-374) as follows:
 "Q All right, sir. Now, why did you go down there, to tell him goodbye?
"A More or less.
 "Q You were really fond of him, wanted to go tell him goodbye?
"A No, I was not fond of him.
. . . . .
 "Q Why did you want him to know he was going to be extradited?
"A Because I felt he had that right to know."
After appellant's conversation with Detective Tillman, he requested his attorney and Sheriff Purvis. Sheriff Purvis talked briefly with the appellant and testified at (R. 379-380) as follows:
 "Q And after he requested to see you what did you say to him?
 "A Our conversation lasted only a few minutes, and I advised him that we were attempting to get an attorney and that I had been told that the attorney would not be available until Monday.
"Q Did you say anything else to him at that time?
 "A Yes, sir. I told him that because of the actions of his brother, who also lived in Lakin, that I felt like Mr. Stahl owed him a lot. I said, `Larry, you owe your brother an awful lot.'
 "Q In addition to that, Sheriff, did you caution Mr. Stahl not to make any statement to you about this particular case?
 "A Yes, sir, I told him I did not intend to talk to him about the case.
. . . . .
 "Q After you told him that you couldn't get him a lawyer that weekend and you didn't want to talk to him about this case, what, if anything, did Lawrence Stahl say to you? *Page 912 
 "A After I told him that he owed his brother a lot, he became emotional and he said to me, `I thought I had left all that sh[___] behind me in Mobile.'"
These incriminating statements that the appellant made to Detective Tillman and Sheriff Purvis that he "didn't kill those people in Mobile, it was Waldrop's gun" and that he "thought [he] had left all that sh___ behind [him] in Mobile," respectively, were a significant part of the prosecution's case against this appellant. They were not, however, the only evidence against him.
Additional incriminating statements were presented through the testimony of Bobby Wyrick, appellant's "cell-mate" in Kearney County Prison in Kansas for several weeks in January, 1980. Wyrick testified that he and appellant discussed appellant's incarceration on several occasions. Appellant told him that he (the appellant) was involved with a man named David
in the shotgun slayings of a man and a woman in Mobile during a robbery in which $2,000 cash money was taken, but that he (the appellant) did not kill anyone and did not own a shotgun. (R. 391-392, 400). The appellant also told him that either appellant's or David's mother worked at the same store as the victims. (R. 391).
Wyrick admitted that he (Wyrick) had been arrested at that time on three counts of "incest" with his daughter and had been previously convicted for "an intentionally overdrawn check."
The prosecution also presented Vera Jane Cox, a Delchamps Food Store employee, who testified that David Waldrop and the appellant were in the store the day before Hacker and Stainback were abducted, but that she had seen neither of them since that time. She explained that Waldrop's mother was also a Delchamps employee and had occasionally made the bank deposits, but that she was absent on the day of the abduction.
Wallace Stewart, a friend of the appellant, testified, among other things, that on occasion prior to the July, 1977, incident, he had been camping with the appellant in the wooded area where the victim's bodies were found.
Pamela Johnson reported that David Waldrop, accompanied bythe appellant, purchased with $1200 cash money a motorcycle from her husband "just before dark" on a day early in July, 1977, (she could not recall the exact date.) Charles Bosarge, the Delchamps Food Store manager, talked with David Waldrop early in the morning on July 12, 1977, (the day after his employees disappeared), when Waldrop brought his "newmotorcycle" by the store to show Bosarge. Waldrop told Bosarge he was going to North Carolina and asked him if there was any news about the disappearance of Hacker and Stainback (the murder victims).
The appellant did not take the stand in his own behalf to explain the incriminating statements used against him or to otherwise defend himself. Instead, his defense consisted of efforts to impeach the key witnesses for the prosecution, and of the testimonies of two witnesses who observed what might have been the abduction in progress on July 11, 1980.
Jo Ann Walker was a waitress at a restaurant across the street and approximately 200 yards (R. 460) from the Delchamps Food Store. She saw for about 15 or 20 seconds Richard Hacker as he proceeded from the Delchamps store. She did not see Ms. Stainback (the other victim) but did see two men on either side of the appellant neither of whom fit the description of the appellant on that date. This incident did not register with her as anything unusual until that night when she learned that Mr. Hacker and Ms. Stainback were "missing."
Myrna Greenlee testified that she was seated in her truck in the Delchamps parking lot when she noticed two men accompany Richard Hacker from the sidewalk toward a car in the parking lot. She stated that Hacker looked "frightened" (R. 429), that he was carrying a brown bag (the bank deposit bag was customarily carried to the bank in a brown paper sack), and that it appeared that a fight might ensue between the two men and Hacker. Her descriptions *Page 913 
of the two men with Hacker did not match the appellant's appearance on that date.
As she left the parking lot she followed a car in which she identified Hacker. He was in the back seat and the two men she had seen with him in the parking lot were on either side of him. In the front seat were a woman and a man, who was driving. Her description of the driver also did not match the appellant's appearance on that date.
She last saw the car with its five occupants heading in the general direction of the wooded area where the victim's bodies were later discovered. She did not report what she had seen until July 26, 1977, two days after the bodies were discovered because she "did not want to get involved."
 I
Appellant's sole contention during oral argument of this case, was that the trial court erred in admitting the statements made to Detective Tillman and Sheriff Purvis because said statements were the product of "interrogation" after the appellant had requested an attorney but before one had been provided. He contends that such "interrogation" was improper because he had invoked his right to the assistance of counsel and at no time "voluntarily" waived said right.
Under the circumstances of this case the key issue is whether or not the appellant's incriminating statements were made during "interrogation." See, Rhode Island v. Innis,446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Since we have determined that appellant's statements were not the product of "interrogation," we need not reach the "waiver of the right to counsel" issue. See, Edwards v. Arizona, 451 U.S. 477,101 S.Ct. 1880, 68 L.Ed.2d 387 (1981).
The appellant argues that the comments directed to him by Detective Tillman and Sheriff Purvis on the morning of January 5, 1980, were part of an obvious "tough guy-soft guy" routine employed as a deliberate attempt to coerce his incriminating responses which followed. He maintains that such conduct was the equivalent of "interrogation." He explains that Tillman should have expected an incriminating response when he told appellant that the Mobile authorities had to return to Mobile but would extradite him for murder and when he described (at appellant's request) the possible penalty for such a crime. Likewise, Purvis should have known that his comments with reference appellant's brother would compel an additional incriminating response.
After a thorough review of the record and appellant's arguments at trial, in brief, and at oral argument, it would be mere conjecture on our part to conclude that the Mobile authorities contrived a scheme (the so-called "tough guy-soft guy" technique insinuated by the appellant) to indirectlycompel this appellant to incriminate himself. There is no evidence in the record that either Tillman or Purvis intimidated or coerced or otherwise induced this appellant. Other than the record of this appeal, we have no way of knowing what intimidating factors might have existed at the Kearney County Jail on that morning with reference this appellant. For aught that does appear in the record the appellant's incriminating statements were not the product of "interrogation" but rather were "volunteered" by the appellant.
This conclusion has been reached in light of the new federal standard for determining when "interrogation" has occurred and after review of the applicable case law.
 II
The United States Supreme Court recently in Rhode Island v.Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980),established the standard for determining when a suspect, who is in custody and has asked for, but not yet received the assistance of counsel, has been subjected to further "interrogation." The Court analyzed the procedural safeguards against compulsory self-incrimination outlined in Miranda v.Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and concluded that:
 "[T]he term `interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the *Page 914 
part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . .
 "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." (Emphasis added, footnotes omitted.)
The court referenced the caveat expressed in Miranda that:
 "`Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk with police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today (emphasis added).' Id., at 478, 86 S.Ct., at 1630."
Therefore, words or actions that authorities should know arereasonably likely to elicit an incriminating response from thesuspect are the "functional equivalent" (i.e., the legal
equivalent) of "interrogation."
As noted in the concurring and dissenting opinions in RhodeIsland v. Innis, supra, we can foresee some difficulty in applying this standard to the circumstances of each specific case. In fact, the United States Supreme Court was rather divided (5-4) as to its application in the Innis, supra, case. There the suspect had been arrested in the vicinity of a school for handicapped children for armed robbery with a shotgun. He had been given the Miranda warnings and had requested an attorney. He had been placed in a police car with several officers who had proceeded to transport him to jail. Two of the officers in the hearing of the suspect began discussing the undesirable consequences if perhaps one of the little handicapped children found the missing shotgun. The suspect immediately led the police officers to the incriminatingshotgun and it and the suspect's statements made in conjunction with its recovery were admitted as evidence against him.
Mr. Justice Stewart, speaking for the majority, applied the new standard to these facts and determined that:
 "[I]t cannot be fairly concluded that the respondent was subjected to the `functional equivalent' of questioning. . . . The case thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few off-hand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly `evocative.' It is our view, therefore, that the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.
 ". . . That the officers' comments struck a responsive chord is readily apparent. Thus, it may be said, . . . the respondent was subjected to `subtle compulsion.' But that is not the end of the inquiry. It must also be established that a suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response. This was not established in the present case." (Emphasis added, footnotes omitted.) *Page 915 
Rhode Island v. Innis, 100 S.Ct., at 1690, 1691.
The United States Supreme Court, therefore, held that it was not "interrogation" when police officers, who needed information as to the whereabouts of a missing shotgun, "subtly compelled" a suspect to divulge such information by commenting,in his presence, that handicapped children might be endangered by it. Apparently the Court felt that the officers involved could not have known that their comments were reasonably likely
to produce the response from that appellant.
We need not justify this application of the new standard inInnis, supra. We need only point out that the conduct of the authorities in the case before us was even less likely to have produced the incriminating responses from this appellant. Detective Tillman told the appellant that the Mobileauthorities had to go back to Mobile but would extradite himfor murder, and in response to appellant's question he told the appellant that the penalty could be death by electrocution. The only motive in evidence for Tillman's conduct was that Tillman felt that the appellant had a right to know that he would beextradited. Certainly, Tillman's comments were not reasonablylikely to elicit the appellant's response that he "didn't kill those people in Mobile, it was Waldrop's gun."
Sheriff Purvis' conduct was even further removed from the realm of "interrogation." He was summoned to appellant's callby the appellant. In a brief conversation with the appellant, Sheriff Purvis reminded him that he owed his brother an awfullot, that because it was a weekend an attorney would not beavailable until Monday and that he (Sheriff Purvis) did notwant to talk to the appellant about the case. The appellant's response that he "thought [he] had left all that sh___ behind [him] in Mobile" was definitely not a likely product of Sheriff Purvis' conduct.
The appellant argues to the contrary that the appellant's responses were foreseeable because they were the product of a deliberate scheme by Tillman and Purvis to elicit them. He contends that Innis, supra, should be distinguished because the comments by the officers in that case were not directed to the suspect as they were here.
However, there is nothing in the record to support appellant's speculation of a "scheme" and the distinction he offers for the Innis case is without merit.
Perhaps the arguments most favorable to appellant's cause with reference the Innis case would be those of the dissenting Justices in that case. Justice Stevens argued that the majority's standard was too narrow and stated as an alternative that:
 "[A]ny police conduct or statements that would appear to a reasonable person in the suspect's position to call for a response must be considered `interrogation.'" (Emphasis added).
Even under this broader objective standard, however, the conduct of Tillman and Purvis in the instant case would not amount to "interrogation." Appellant's incriminating statements were simply not reasonably called for by the officers' comments.
Justice Marshall's opinion in Innis was that the majoritymisapplied the standard it devised, because the police officers' comments in that case, in the presence of the appellant, were the equivalent of actually asking the suspectabout the missing shotgun. In other words, the officers shouldhave known that their comments with reference the danger of the missing shotgun to handicapped children would likely compel the suspect to incriminate himself.
However, such is not the case before us. There is no analogous connection between the conduct of Tillman and Purvis and the responses of this appellant. Only speculation as to the motives of these officers could lead one to conclude that their conduct was intended to elicit these responses from this appellant.
Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880,68 L.Ed.2d 387 (1981), is the most recent United States Supreme Court decision dealing with the subject of "interrogation" after the invocation of the right to counsel. The Court affirmed the new *Page 916 
"interrogation" standard established in Rhode Island v. Innis, supra, but had no occasion to apply it because it was "clear that Edwards was subjected to custodial interrogation."
Apparently the investigating officers, themselves, admitted that they reinterrogated the suspect, acting on the assumption that he had waived his right to counsel. That appellant's conviction was overturned because the Court found that avoluntary waiver of the right to counsel was not given. In dicta the Court stated that if there had been no subsequent "interrogation," "there would have been no infringement of the right [to counsel] . . . and there would be no occasion to determine whether there had been a valid waiver." Chief Justice Berger in his concurring opinion in Edwards v. Arizona, supra, noted that "the notion that any `prompting' of a person in custody is somehow evil per se" was rejected in Rhode Island v.Innis.
Contrary to appellant's assertions, Edwards v. Arizona, supra, is, therefore, only applicable to the instant case because it reaffirms the "interrogation" standard established in Innis, supra, and confirms the fact that a determination that there was no "interrogation" necessarily preempts the "waiver" issue.
Curiously, in a case which preceded Innis, supra, with a fact situation almost identical to that presented in Innis, supra, the United States Supreme Court had determined that there was
subsequent "interrogation" after a suspect had not only invoked his right to counsel but had also spoken with and had been advised by counsel. Brewer v. Williams, 430 U.S. 387,97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). In Williams, the investigating officers had been unable to find the body of a missing girl whom they believed had been murdered. In transporting the suspect, a mental patient with deep religious convictions, an officer told him, in essence, that it would be a shame if the snow (predicted for that evening) covered up the little girl's body before they could find it because she deserved a Christian burial. The Court held that the fact that the suspect then led the officers to the body should not have been used against him because his actions and statements were coerced by appealing to his peculiar sensitivities, of which the officers were aware.
The apparent distinctions drawn between Williams, supra, andInnis, supra, by Justice Stewart, who authored both opinions, were the suspect's known mental condition and religious sensitivity in Williams, the officer's admitted attempt to re-interrogate the suspect in Williams, and the fact thatWilliams involved Sixth Amendment rights while Innis involved Fifth Amendment rights.
In any event, we need not attempt here to reconcile the Innis
and Williams decisions. Even if we believed, as Justice Marshall did, that the "interrogation" standard was misapplied in Innis, supra, and should have been applied with results similar to Williams, supra, we would reach the same conclusion in applying this standard in the instant case. There was nothing "evocative" in the statements made by Tillman and Purvis to this appellant. There was no connection between said statements and the responses given as there was with the reference to the shotgun in Innis, supra, and to the littlegirl's body in Williams. (See also, United States v. McCain,556 F.2d 253 (5th Cir. 1977); and United States v. Jordan,557 F.2d 1081 (5th Cir. 1977) for situations similar to Williams
where statements were held inadmissible.)
We reemphasize the caveat in Miranda, supra, that the Fifth Amendment does not prevent the "police" from talking to suspects and does not bar "volunteered statements" of any kind. It would have been a simple matter for the Court to have stated in Miranda, supra, or in Innis, supra, that all statements resulting from any communication with or prompting of a suspect after he had invoked his right to but had not received counsel are inadmissible, if that had been its intention.
Since we have determined that appellant's statements in thisinstance were "voluntary" and not induced by "interrogation", it is our decision that the trial court did not err in admitting said statements. *Page 917 
 III
Appellant contended in brief that the Alabama Supreme Court's decision in Beck v. State, 396 So.2d 645 (Ala. 1981), which revived Alabama's "death penalty" statutes by ruling that lesser included offenses must be considered in a "death penalty" case, is unconstitutional in violation of the "separation of powers" doctrine and, consequently, that appellant was convicted under an unconstitutional statute. However, in oral argument the appellant did not pursue this issue, which we have recently decided against him in Clisby v.State, (Ms. March 2, 1982), (Ala.Cr.App. 1982); and Potts v.State, 426 So.2d 886 (Ala.Cr.App. 1982).
There being no error of record this cause is due to be and is hereby affirmed.
AFFIRMED.
All the Judges concur.