462 So.2d 981 (1984)
Charles Thomas PHILLIPS
v.
STATE.
6 Div. 96.
Court of Criminal Appeals of Alabama.
August 14, 1984.
On Return to Remand October 9, 1984.
Rehearing Denied November 13, 1984.
Certiorari Denied January 25, 1985.
*983 George W. Andrews III and Carl J. West, Jr., Birmingham, for appellant.
*984 Charles A. Graddick, Atty. Gen., and James B. Prude, Asst. Atty. Gen., for appellee.
Alabama Supreme Court 84-216.
BOWEN, Presiding Judge.
Charles Thomas Phillips was indicted for the murder of Henry Bearden, and the attempted murder of Walter Sharp. The cases were consolidated for trial. After a guilty verdict on each charge and a showing of three prior felony convictions, Phillips was sentenced to life imprisonment without parole as an habitual offender.
The State's evidence established that in the early morning hours of February 21, 1982, the defendant and his brother, Donald, approached the door of the Touchdown Cafe in Birmingham, and asked Mr. Douglas Huguley, the proprietor, if they could play pool. Huguley told them all the tables were in use, and they responded that they would come back later. After a few minutes, Huguley saw the defendant run in front of the building with a gun as two patrons of the Touchdown Cafe, Mr. Walter Sharp and Mr. Henry Bearden, walked out the front door.
Sharp testified that when he opened the door he saw someone crawling under a car in the parking lot saying "Don't shoot." Sharp then saw two black men, one of whom said, "If you move I'll shoot your damn brains out." Sharp stated that Bearden told the black men, "We ain't got nothing to do with what's going on out here; we came out to go home." One of the assailants replied, "If you move out of your tracks I'll blow your brains out." Bearden stepped off the curb and was shot. Sharp then turned around to go back inside the cafe and was shot in the back. He identified the defendant as the man who shot him.
Mr. Robert Ellisor and Mr. Jesse Drake, who were also at the Touchdown Cafe at the time of the shooting, identified the defendant and his brother as the two black men outside. Ellisor stated that he saw the defendant with a gun. Drake testified that he did not see the gunman who shot Bearden, but he did see the defendant's brother shoot Sharp.
Birmingham Police Officer Michael Curry and his partner, Officer Paul Rhodes, responded to the call of a shooting at the Touchdown Cafe. Several blocks from the cafe, they noticed two black males walking down the street. They saw one drop a gun and keep walking. The two officers approached the pair, told them to halt, and when they failed to do so, forced them to the ground and subdued them. Curry and Rhodes retrieved a revolver from Donald and three live .22 caliber bullets from the defendant. They took the brothers to the North Birmingham Precinct and then back to the Touchdown Cafe for a "show-up" identification, where at least seven witnesses identified the defendant as one of the two black males seen outside the cafe during the shooting.
Birmingham Police Sergeant James E. Gay testified that, after the defendant was arrested, he saw him at the Birmingham City Jail, advised him of his Miranda rights and took his statement. After presenting expert testimony establishing the cause of Henry Bearden's death, and linking the projectiles removed from the victims' bodies to the revolver discarded near the scene, the State rested.

I
The defendant contends that the trial judge admitted improper evidence of four prior felony convictions for purposes of sentencing under the Habitual Felony Offender Act.
At the sentencing hearing, the State introduced four exhibits to prove prior felony convictions. State's exhibit one was a "Judge's Statement" dated September 17, 1984, ordering "Charles Phillips" committed to a Michigan State penal institution for a minimum period of fifteen months and a maximum period of fifteen years. The defendant objects because the document does not show that he was represented by counsel and contains no attestation and is, therefore, not properly authenticated *985 as required by Alabama Code 1975, § 12-21-70.
State's exhibit two is a trial docket sheet from the Circuit Court of Jefferson County, Bessemer Division, showing that "Charles T. Phillips" pled guilty to burglary II on April 30, 1963. The defendant contends that this conviction does not constitute a felony under § 13A-1-2(4), because at the time of this conviction he was sixteen years old. He argues that his conduct "would be a juvenile offense and not admissible under § 13A-5-9, without proper transfer proceedings to the Circuit Court, which was not done in this case." The defendant also argues that the docket sheet is insufficient to show that he was represented by counsel at the time of the plea, arguing that "[w]hile the document reflects the name `J.H. McEniry' in the upper left-hand corner, it does not reflect at what point Mr. McEniry became involved, and to what extent in the case." He further notes that the guilty plea was the same year the United States Supreme Court decided Gideon v. Wainwright, 372 U.S. 335, 336, 83 S.Ct. 792, 792, 9 L.Ed.2d 799 (1963), recognizing the accused's Sixth Amendment right to counsel.
State's exhibit three is a trial docket sheet of the Circuit Court of Jefferson County showing that "Charles Thomas Phillips, alias Charles Phillips", pled guilty to grand larceny on June 1, 1969. This exhibit shows that the defendant was represented by appointed counsel.
State's exhibit four is a trial docket sheet from the Circuit Court of Jefferson County showing that "Charles Thomas Phillips, alias Larry Alexander", pled guilty on May 3, 1972, to the offense of robbery, and was sentenced to ten years' imprisonment. Although the defendant objected to the admission of State's exhibits three and four at the sentencing hearing, he does not pursue those objections on appeal, but limits his argument to State's exhibits one and two.
At the sentencing hearing, the State also introduced the statement the defendant gave Sergeant Gay on November 15, 1982. Therein, the defendant admits that he had been to prison for grand larceny, robbery and car theft.
Although the State presented four prior felony convictions, the trial judge sentenced the defendant to life imprisonment without parole as a habitual offender based on three prior convictions.
At the motion for new trial, attorney J.H. McEniry testified that he checked his old files and "found nothing in there to indicate anything under Charles T. Phillips." The defendant introduced trial docket sheets to show that, at the time of his guilty plea in April of 1963, the Circuit Court in Bessemer had a "court appointed stamp", even though the stamp was not used on the defendant's 1963 guilty plea.
The trial judge found that State's exhibit two adequately showed that the defendant was represented by counsel: "I think the representation shown is as clear as you can get it. I'm satisfied with it. I think representation is shown as clear as the Courts require at the moment. What they do later on is something else."
At a sentencing hearing on the determination of a habitual felony offender, "The burden of proof shall be on the State to show that the defendant has been convicted of a previous felony or previous felonies. Disputed facts shall be determined by the court by a preponderance of the evidence." Rule 6(b)(3)(iii), A.R.Crim.P.Temp.
State's exhibits two, three and four were certified copies of trial docket sheets and constitute proper proof of those prior convictions from Jefferson County. Kemp v. State, 434 So.2d 298, 303 (Ala.Cr. App.1983). Under Burgett v. Texas, 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967), a prior conviction cannot be used to support guilt or enhance punishment unless the accused was represented by counsel or properly waived counsel in the prior proceeding. Seritt v. State, 401 So.2d 248, 251 (Ala.Cr.App.1981).
In State's exhibit two, an attorney's name was written on the docket sheet *986 by the circuit court judge in the space labeled "attorneys". We think this constitutes prima facie evidence that the defendant was represented by counsel at the time he pled guilty. "There does not appear to be any law which requires that the name of the attorney appear at any particular place in the record so long as it properly appears that the defendant on trial was represented by an attorney." Minor v. State, 437 So.2d 651, 656-57 (Ala.Cr.App.1983).
Although the defendant was a juvenile at the time of his 1963 conviction of burglary in the second degree, that offense under both the pre-existing Alabama criminal law and the new criminal code is a felony. Commentary to Alabama Code 1975, § 13A-7-7 (under the present Criminal Code, second degree burglary, § 13A-7-6, encompasses former second degree burglary, § 13-2-41). The defendant was not treated as a juvenile and the prior felony conviction may be used to enhance punishment. This does not violate the rule that a prior juvenile or youthful offender adjudication may not be considered a prior felony conviction for purposes of the Habitual Felony Offender Act. Ex parte Thomas, 435 So.2d 1324, 1326 (Ala.1982).
Since the Michigan "Judge's Statement" was not properly authenticated pursuant to Alabama Code 1975, § 12-21-70, this fourth felony conviction should not have been considered in enhancing punishment. However, since only three prior convictions were necessary to sustain the sentence imposed, there was only harmless error in its introduction. Watson v. State, 392 So.2d 1274, 1279 (Ala.Cr.App.1980), cert. denied, Ex parte Watson, 392 So.2d 1280 (Ala.1981). We also note that in his statement to Sergeant Gay, the defendant admitted having served three prior terms of imprisonment arising out of convictions for grand larceny, robbery and car theft. "[T]he admission ... contained in that confession... removed the State's burden of proving a prior conviction...." Moseley v. State, 398 So.2d 357, 359 (Ala.Cr.App.), cert. denied, 398 So.2d 359 (Ala.1981).

II
The defendant claims that the State failed to establish a proper chain of custody for a bullet allegedly extracted from Walter Sharp. The State's evidence showed that in the early morning hours of February 21, 1981, nurse Rhonda Edwards received a bullet from the operating physician, labeled it, and took it to the hospital laboratory. The lab was unmanned when nurse Edwards arrived and she left the bullet on a specimen table outside the lab. Later that morning, Deputy Coroner Charles Robey saw the specimen cup containing the bullet and asked medical technologist William Jeff, who had by then come on duty, to sign for it. The remainder of the chain of custody was proved without objection by the defense. The defendant contends only that the time lapse in which the specimen cup containing the bullet was left unattended in the hall outside the hospital lab constitutes a break in the chain of custody.
Initially, we note that "[t]he evidence need not negate the most remote possibility of substitution, alteration, or tampering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain." Slaughter v. State, 411 So.2d 819, 822 (Ala.Cr. App.1981). Even taking into account the period during which the evidence remained on the specimen table outside the lab, the State's proof established a "reasonable certainty that there ha[d] been no substitution, alteration, or tampering with the specimen." Gothard v. State, 452 So.2d 889 (Ala.Cr.App.1984) (Quoting A. Moenssens & F. Inbau, Scientific Evidence in Criminal Cases § 1.18 at 58 (2d ed. 1978). Compare Sims v. State, 428 So.2d 162 (Ala.Cr. App.1982) (No testimony from firearms expert as to person from whom he received alleged murder weapon).
Nurse Edwards testified that "we have guards throughout the hospital. I don't think any outsiders would get in." Since *987 Edwards stated that she left the specimen unchanged in the exact place where Deputy Coroner Robey found it, the time during which it was unattended presents, at most, a weak link rather than a missing link in the chain of custody. Compare Whetstone v. State, 407 So.2d 854, 859-60 (Ala.Cr.App. 1981) (No evidence as to who withdrew defendant's blood presents a "missing" rather than a "weak" link in chain). "Where a weak link in the chain of custody is said to exist, it presents a question of the credit and weight to be accorded rather than ... the admissibility of the item." Williams v. State, 375 So.2d 1257, 1267 (Ala.Cr.App.), cert. denied, 375 So.2d 1271 (Ala.1979).

III
Officer Rhodes testified that, upon being returned to the scene for a "show-up" identification, the defendant yelled at least twice, "Yeah, I killed the M____ F____." The defense moved to exclude the exclamation because it was the result of a beating by the police and because the defendant had not been warned of his constitutional rights.
The defendant presented no evidence at the hearing on motion to exclude his exclamation of having been beaten by the police, although defense counsel referred to a photograph of the defendant taken by the police after his arrest and introduced into evidence by the State, which allegedly showed some swelling on the side of his face. Later in the trial, Donald Phillips, the defendant's brother, testified that the two of them were beaten by patrons of the Touchdown Cafe before the shooting, and by the police after the shooting. In the defendant's statement to Sergeant Gay, he does mention having been beaten by the police. Officers Gay, Curry and Rhodes denied beating the defendant or seeing anyone else beat him. Curry did testify that in order to apprehend the defendant he had to push him down forcibly, and that he had to drag the defendant to the patrol car when he refused to walk.
The trial judge was in the best position to determine the credibility of the witnesses on this issue. His ruling is supported by substantial evidence and will not be overturned on appeal. See Womack v. State, 435 So.2d 754, 761 (Ala.Cr.App.), affirmed, 435 So.2d 766, 767 (Ala.1983).
Likewise, the trial court's ruling regarding the admissibility of the defendant's exclamation in the absence of Miranda warnings is also correct. All three officers testified, and the defendant does not claim otherwise, that they did not question the defendant prior to his exclamation. "Spontaneous or volunteered statements fall outside the mandate of Miranda." Terry v. State, 397 So.2d 217, 221 (Ala.Cr.App.), cert. denied, 397 So.2d 223 (Ala.1981). The atmosphere surrounding the "show-up" identification was not coercive, likely to produce an incriminating response, or the "functional equivalent" of interrogation. See Stahl v. State, 426 So.2d 909, 913-14 (Ala.Cr.App.1982), cert. quashed, 426 So.2d 917 (Ala.1983), and authorities cited therein.
"When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding.... The fundamental import of the privilege [against self incrimination] while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.... Volunteered statements of any kind are not barred by the Fifth Amendment...." Miranda v. Arizona, 384 U.S. 436, 477-78, 86 S.Ct. 1602, 1629-30, 16 L.Ed.2d 694 (1966).

IV
After the defendant was taken to the city jail, Sergeant Gay advised him of his constitutional *988 rights, obtained a signed waiver, and interrogated him.
The defendant first maintains that none of the statement should have been admitted because, as he argued previously, he had been physically abused. In part III of this opinion, we have answered his contention regarding the alleged beatings.
The defendant also argues that certain portions of the statement, specifically several of Sergeant Gay's questions alluding to the defendant's "meanness" or his commission of other crimes, should have been excluded. Although the trial judge ruled these portions admissible after the voluntariness hearing, the prosecutor did not read the questioned segments to the jury and they were, in fact, excluded. No error appears in the record. A.R.A.P. 45.

V
The defendant argues that the in-court identification of him by witnesses Huguley and Ellisor should have been excluded because they were tainted by the prior "show-up" identification at the Touchdown Cafe. He also insists that victim Walter Sharp's identification of him in the courtroom was improper because Sharp had been previously subjected to a suggestive photographic array during his hospitalization for the wound he received during the shooting. In our judgment, both in-court identifications were admissible.
Although a one-man "show-up" is by its nature suggestive, it is "not inherently unfair, and it is settled law that prompt, on-the-scene confrontations are not constitutionally impermissible, but are consistent with good police work." Hobbs v. State, 401 So.2d 276, 279 (Ala.Cr.App.1981); Denson v. State, 348 So.2d 1139 (Ala.Cr. App.), cert. denied, 348 So.2d 1142 (Ala. 1977). If, under the totality of the circumstances, an identification is reliable then the in-court naming of the defendant is proper notwithstanding a prior suggestive confrontation. Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Reliability depends upon "the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation and the length of time between the crime and the confrontation." Manson v. Brathwaite, 432 U.S. at 114, 97 S.Ct. at 2253; Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375, 382-383, 34 L.Ed.2d 401 (1972).
In the present case, both Huguley and Ellisor had ample opportunity to view the defendant prior to and during the shooting. Huguley talked with the defendant and his brother face-to-face for several minutes at the door of the Touchdown Cafe. Ellisor encountered and spoke with the Phillips brothers in the parking lot outside the cafe, watched them during the shooting, and then saw them flee. Although there was no specific testimony regarding their degree of attention, it can be fairly presumed that once a pistol was drawn their attention was riveted on the occurrences that followed. Both men gave an accurate description of defendant's clothing, and both made a positive identification during the "show-up", which was conducted between thirty minutes and one hour after the shooting. In short, the record contains nothing which would undermine the reliability of their prior identifications, or lead to the conclusion that they may have mistaken the defendant for someone else.
The defendant claims that the identification by Sharp was suspect because, at the time he viewed the photographic array, Sharp knew someone had been arrested and was pictured in the array. While this knowledge is suggestive, it is not unnecessarily so, and does not contaminate the identification procedure. Phillips v. State, 409 So.2d 918, 919 (Ala.Cr.App.1981). "[I]t is perfectly natural for a person called to make an identification from photographs to understand that a suspect's picture is among those photographs." 409 So.2d at 919.
*989 The defendant also contends, and we are inclined to agree, that the array shown to Sharp was unduly suggestive because the defendant's picture was the only one, of a set of some twelve photographs, which was marked "2-21-82", the date of the shooting. Nevertheless, in our judgment, Sharp's identification of the defendant in court was admissible because it was reliable under the foregoing "totality of the circumstances" test. Manson v. Brathwaite, 432 U.S. at 114, 97 S.Ct. at 2253.
Sharp testified that he looked directly at the defendant and saw him shoot Bearden before Sharp ever turned his back to walk back inside the cafe. Sharp also gave an accurate description of the defendant's clothing to the police. Without hesitation, he picked the defendant's photograph from the twelve snapshots shown him in the hospital approximately a week after the shooting. Applying the Biggers test to the identification procedure used here, we find that notwithstanding the suggestiveness of dating the defendant's picture, Sharp's identification at trial was reliable under the circumstances because it had a basis independent of the photograph. See Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

VI
There is no error in the State's using its peremptory strikes to remove all black jurors from the venire. Robinson v. State, 428 So.2d 167 (Ala.Cr.App. 1982).

VII
The defendant insists that the court erred in overruling his motion for mistrial because spectators in the courtroom tried to influence the jury. At 11:13 A.M. on the third day of trial, following a defense motion for judgment of acquittal based on failure of the State to present a prima facie case, the following occurred:
"MR. JOHNSON [Defense Counsel]: We would further move for a mistrial and as grounds state that on several occasions, and Your Honor is aware of it, that there have been instances where spectators haveas late as yesterday evening when the jurors were leaving there were a number of people that left out front of the jurors and were stationed out in the hall. There have been some speaking to the jurors on one occasion when the jurors left the courtroom to go back by the spectators from the deceased family. We feel that there's no way that that can be eradicated, that it's highly prejudicial. We would move for a mistrial.
"THE COURT: All right. I don't understand anyone spoke to a juror. I know you mentioned when the jury went back there was the nodding out there.
"MR. JOHNSON: Yes, sir, that's what I meant. There was nodding of the head to each juror in a way of speaking without saying words. There was a nodding to each juror.
"THE COURT: I have warned them and warned them. They're going to keep it up and there's going to be a problem. Yesterday afternoon I had a bailiff escort the jury to the elevators just for that purpose, to guard the jury from that. It apparently worked. Let's hope it will work the rest of this time.
"I'm going to overrule the motions.
"MR. JOHNSON: We respectfully except." (Emphasis added).
The defendant argues that the intensity of emotion on the part of members of the victims' families, and the attempts by spectators to influence the outcome of the trial are illustrated by the following warning issued by the court earlier in the trial:
"(Side-bar conference, off the record.) (All witnesses present.)
"THE COURT: To all the witnesses, all the spectators, all the would be witnesses, all the message takers, a lawyer, an out of town lawyer that isn't even connected with this case was in here yesterday. After listening a while then went outside in the hall and some of the spectators out here were out telling the witnesses what the witnesses were testifying to, particularly when Sharp was testifying. This lawyer I'm talking about hasn't got any ax to grind, doesn't give a *990 hoot one way or the other. She's not even from around here. She just happened to be here and happened to be interested in this case. So she listens to this case. So she passes it on. I can't impress upon ya'll if we mistrial this case and have to try this case again I'm going to hold everyone here until it gets cold. You've got to be careful what you say and what you do. No one seems to recognize the fact that this thing can mistrial any minute. Somebody has got to be careful what they say and what they do. There's no reason not to believe that this lawyer that comes and tells me this stuff. She has no reason not to tell the truth. She could care less. I'm just telling you when you go out and start talking to witnesses and when I tell you the rule is invoked, I mean the rule is invoked and you're not supposed to talk about the case. I know you must do it. I'm going to have to declare a mistrial just like the last time. I'm just warning everybody again be careful. Let's not have it happen. Everybody go."
In our judgment, the fact that defense counsel waited from Tuesday evening (when the alleged nodding by the spectators to the jury occurred) until late Wednesday morning (following further progress of the trial and a routine motion for judgment of acquittal), to move for a mistrial based on vitiating jury influence undermines his claim that the spectators' conduct was so improper as to call for drastic measures by the trial judge. From aught that appears in the record, counsel never requested to have the jury questioned or instructed regarding the alleged influence on them, and only moved for a mistrial later the following day.
Nevertheless, a trial judge should make a reasonable investigation of irregularities claimed to have been committed. The trial judge has a duty to "investigate the circumstances under which the remark [or gesture] was made, its substance, and determine [whether] the rights of the appellant were ... prejudiced...." Bascom v. State, 344 So.2d at 222. The court should determine whether a mistrial is "necessary to preserve the impartiality or even the appearance of impartiality of the jury." Woods v. State, 367 So.2d 974, 979 (Ala.Cr.App.), reversed, 367 So.2d 982 (Ala. 1978).
The test in cases of unauthorized jury confrontation with outsiders is not whether the communication actually influenced the jury, but whether it might have affected their verdict. Bascom v. State, 344 So.2d 218 (Ala.Cr.App.1977); Roan v. State, 225 Ala. 428, 143 So. 454 (1932).
Because the record contains no indication of any investigation by the court into the circumstances of the confrontation with the victims' families, or the possible influence upon the jury, we remand this cause with directions that the trial court investigate these matters and make a finding regarding prejudice to the defendant. Dean v. State, 54 Ala.App. 270, 278, 307 So.2d 77 (1975) (Trial judge heard "considerable testimony" on allegation that juror communicated by hand signals with grandfather of accused). We recognize that the record shows that the trial judge was aware of the spectators nodding to the jurors. The judge may have investigated this matter and determined that the defendant was not prejudiced. If that is the situation, the trial judge on remand may merely make a finding of what actually occurred without holding a hearing on this issue.
In remanding this cause, we are attempting to frustrate the defendant's collateral attack upon his conviction. The record before us contains five petitions for writ of error coram nobis filed by the defendant after his conviction. In the first petition, he alleges that "said family of the deceased did talk and converse with jury members between breaks in trial.... In no way did Judge, D.A. or my lawyer try at any time to stop said family from conversing with Jury members." Thus, a remand is also in the interests of judicial economy.
REMANDED WITH DIRECTIONS.
All Judges concur.

*991 ON RETURN TO REMAND
BOWEN, Presiding Judge.
On remand, the trial judge issued a written order in which he found that "[n]odding is not a `way of speaking without saying words' in this court's judgment." The order concludes: "It is this court's finding of facts and law that defendant received a fair and impartial trial; that the jury was not in any manner prejudiced, were not confronted by the victim's families or spectators; that their verdict was not influenced or affected by outsiders. The verdicts were arrived at by an impartial and just jury."
There being no evidence to contradict these findings, the judgment of the circuit court is affirmed.
OPINION EXTENDED; AFFIRMED.
All Judges concur.